UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
BRENDA WARKOW,

                              Plaintiff,                      Docket No.:

      -against-                              **COMPLAINT**

S & P GLOBAL INC and
MARTINA CHEUNG,                        **JURY TRIAL DEMANDED**
                            Defendants.
-------------------------------------------------------------------X

Plaintiff Brenda Warkow ("Ms. Warkow" or "Plaintiff") files this Complaint against Defendant S&P Global Inc. ("S&P") and Martina Cheung ("Ms. Cheung") (collectively, "Defendants").

## I.    INTRODUCTION

1. In October 2023, Ms. Warkow, who was 63-years old at the time, was employed as a high-level Sales Manager and executive with PIMCO, a company she had been with for 17 years. Targeting Ms. Warkow for her superior sales and sales management experience, S&P and Martina Cheung, S&P's current Chief Executive Officer, lured Ms. Warkow away from her position with PIMCO to serve as S&P's Managing Director, Head of Sales, Americas, for S&P Global Ratings. In recruiting Ms. Warkow, S&P and Ms. Cheung represented to Ms. Warkow that S&P wanted Ms. Warkow, even though she lacked ratings experience, because of her extensive sales experience. Ms. Cheung told Ms. Warkow that she wanted Ms. Warkow to turn the struggling S&P sales team around and turn the team from "farmers" to "hunters." In this regard, Ms. Cheung also assured Ms. Warkow that S&P intended to invest in her as an employee, that it needed her

1

sales expertise and that the position was long-term despite her lack of ratings experience. In reliance on S&P and Ms. Cheung's representations, Ms. Warkow accepted the position at S&P.

2. As set forth below, Ms. Warkow now knows that S&P's and Ms. Cheung's representations to her about the nature of her position at S&P were false. In fact, S&P and Ms. Cheung never intended to keep Ms. Warkow as Head of Sales past a date certain. Specifically, at the time they hired her, S&P and Ms. Cheung knew that the company intended to use Ms. Warkow's sales and sales management experience to transform the S&P sales team into a successful and collaborative unit, and then remove Ms. Warkow from the position as soon as the non-compete of another employee, Marti Correa, expired at the end of 2024. S&P and Ms. Cheung then intended to replace Ms. Warkow as head of Sales with Ms. Correa.

3. And in fact, that is exactly what happened. Ms. Warkow began working for S&P in 2023. She walked into a toxic situation with a dysfunctional team of direct reports and salespeople who were reactive verses proactive in their outreach to clients. With the encouragement, participation and approval of S&P's executives, Ms. Warkow exited three of her direct reports and performed a comprehensive reorganization of the entire Americas Sales Team in Canada, Latin America, and the United States  It was a difficult job, but Ms. Warkow was willing to do it and in doing so, she set the sales team up for overwhelming success in 2024 and 2025.

4. Ms. Warkow was also spectacularly successful in driving sales to record levels at S&P in 2024. Despite Ms. Warkow's phenomenal performance, as soon as Ms. Correa's non-compete expired at the end of 2024 and after reaping the benefit of Ms. Warkow's successful sales results, S&P suggested to Ms. Warkow that she look for another, lower position within the company. But when Ms. Warkow declined to do so, S&P abruptly terminated her. Ms. Warkow's

termination came shortly before she turned 65, one day before she was to receive her 2024 equity award valued at $375,000, and twelve (12) days before her annual performance bonus was to be paid on March 12, 2025. Within thirty minutes of Ms. Warkow's termination, S&P announced Ms. Correa as her replacement.

5. Ms. Warkow brings suit under New York law against S&P and Ms. Cheung for fraudulent inducement and against S&P for breach of contract. Had Ms. Warkow known that S&P's and Ms. Cheung's true intent was to hire her to take advantage of her extensive sales experience only to replace her with Ms. Correa as soon as Ms. Correa's non-compete expired, Ms. Warkow never would have left her position at PIMCO. As a result of S&P and Ms. Cheung's fraudulent and bad faith conduct, Warkow has and will continue to lose out on millions of dollars in wages, bonuses, equity, and other benefits.

## II.     PARTIES

6. Plaintiff Brenda Warkow is an individual residing in Travis County, Texas and has resided there at all times relevant to the allegations in this Complaint.

7. Defendant S&P Global Inc. is a corporation organized under the laws of the state of New York with its principal place of business at 55 Water Street, New York, New York 10041. Citation may be served on Defendant by serving its registered agent, Corporation Service Company, at 80 State Street, Albany, New York 12207.

8. Defendant Martina Cheung is an individual residing in Westchester County, New York and has resided there at all times relevant to the allegations in this Complaint. Ms. Cheung resides at 195 Old Army Road, Scarsdale, New York 10583 and her place of business is at 55 Water Street, New York, New York 10041. Ms. Cheung may be served with process at her residence, her place of business, or wherever she may be found.

### III. JURISDICTION AND VENUE

9. This Court has jurisdiction under Ms. Warkow's employment and restricted stock unit agreements with Defendant S&P, as any suit arising or relating to the terms of those agreements is to be commenced in the United States District Court for the Southern District of New York, and therefore, both parties have consented to the jurisdiction of this Court.

10. Additionally, this Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332 because the suit is between citizens of different states and the amount in controversy exceeds $75,000.00, exclusive of interest and costs. Specifically, Plaintiff is a citizen of Texas, and Defendants are citizens of New York.

11. Venue is proper under 28 U.S.C. § 1391(b)(1-2), in that the Defendants reside in this judicial district and division, and in that a substantial part of the events or omissions forming the basis of this suit occurred in this judicial district.

### IV. STATEMENT OF FACTS

**A. S&P and Ms. Cheung fraudulently induces Ms. Warkow to leave her employment at PIMCO.**

12. Ms. Warkow was hired in October 2023 to serve as Managing Director, Head of Sales, Americas, for S&P Global Ratings. Ms. Cheung, who is currently the Chief Executive Officer of S&P and a former colleague of Ms. Warkow at the Kellogg School of Management at Northwestern University, personally recruited Ms. Warkow for the position at S&P.

13. At the time of her recruitment by Ms. Cheung, Ms. Warkow was employed by PIMCO as Senior Vice President and Head of Edward Jones Sales, U.S. Global Wealth Management. She had been employed by PIMCO for over 17 years. Warkow was paid over $1.1 million per year at PIMCO, in addition to benefits, and had no plans to leave PIMCO's employ.

14. Ms. Cheung told Ms. Warkow that S&P wanted Ms. Warkow to head their sales

4

team in the Americas because Ms. Warkow had a strong sales background and a proven track record of sales management success and could bring a fresh perspective to the S&P sales team which was struggling at the time. In Ms. Cheung's words, she wanted Ms. Warkow to turn S&P's "farmers" into "hunters" by coaching and mentoring the sales team to sell.

15. Ms. Warkow was concerned about leaving her longtime employment at PIMCO—particularly given that she was over 60 years of age and did not have any experience with ratings. She asked about whether S&P was committed to bringing someone without ratings experience into the position and committed to supporting her as she learned the business to succeed in the position long-term. Ms. Warkow was assured by Ms. Cheung and others that this was the case and that the timing was great to bring someone in from outside the ratings industry.

16. Before being hired by S&P, Ms. Warkow participated in twelve extensive interviews for the position. She also had very detailed compensation negotiations with S&P to ensure her annual compensation was at least equal to what she was paid by PIMCO and that the M units and the Long Term Incentive Plan money that she had earned at PIMCO over the last 17 years would be paid out to her in Restricted Stock Unites ("RSUs") to compensate her for leaving those behind.

17. Ultimately, based on S&P's and Ms. Cheung's representations to her, Ms. Warkow agreed to leave her stable, long-term, and lucrative position at PIMCO to be the Managing Director, Head of Sales, Americas at S&P. In her role at S&P, Ms. Warkow reported to Lynn Maxwell, Chief Commercial Officer.

18. S&P and Ms. Cheung further represented that S&P needed Ms. Warkow to start immediately, so Ms. Warkow left PIMCO in October 2023. In leaving her position at PIMCO, Ms. Warkow justifiably relied on S&P and Ms. Cheung's representations to her about the nature

5

of her position and employment at S&P, as well as S&P's plans for the position. Ms. Warkow trusted that S&P and Ms. Cheung were being truthful and fully transparent about the reasons they wanted Ms. Warkow to work at S&P and the nature of the position itself.

**B. Despite her stellar performance and S&P's representations, S&P terminated Ms. Warkow shortly after Ms. Correa's non-compete expired and within 30 minutes, replaced her with Ms. Correa.**

19. Unbeknownst to Ms. Warkow, at the time she left her employment at PIMCO and accepted employment with S&P, the company had hired a woman only a few months earlier named Marti Correa. Unlike Ms. Warkow, Ms. Correa had ratings experience. Ms. Correa was previously the head of sales at another credit rating agency but due to a non-compete agreement with that agency, could not be employed as Head of Sales at S&P at the time she was hired.

20. Because it could not immediately place Ms. Correa into the position as Head of Sales for Americas, S&P parked Ms. Correa in a newly created and temporary position just for her, titled Head of Global Commercial Strategy, Product and Operations, until her non-compete expired. At the time S&P hired Ms. Correa and installed her in her temporary position, it knew and intended that she would assume the position of Head of Sales for Americas as soon as her non-compete expired.

21. S&P and Ms. Cheung failed to disclose any of these facts and plans for Ms. Correa to Ms. Warkow at the time it hired her.

22. After Ms. Warkow joined S&P, she began to hear from several people in the company that her supervisor, Ms. Maxwell, was very close with Ms. Correa. Ms. Warkow further heard that Ms. Correa's intent and plan was that she would assume Ms. Warkow's role when her non-compete expired.

23. Concerned about the stability of her position, Ms. Warkow inquired on several occasions about whether S&P intended for Ms. Correa to assume her position as Head of Sales after her non-compete expired, but S&P and Ms. Maxwell repeatedly represented to Ms. Warkow that was not the case, that "Marti Correa was interested in a larger role and had already managed a sales team" making yet more false representations.

24. Perhaps sensing Ms. Warkow's concern that S&P wanted to place Ms. Correa in her role, Ms. Maxwell granted Ms. Warkow additional equity on March 1, 2024 for her excellent performance, to vest in three equal tranches beginning on December 31, 2025. But this equity award, like everything else, turned out to be yet another false promise to keep Ms. Warkow.

25. Throughout 2024 and to the end of her tenure in February 2025, Ms. Warkow worked long, hard hours to re-organize the sales team across Canada, Latin America, and the United States. She traveled each week to get to know each member of the sales team and trained them on an individualized basis, she eliminated weak links on the team and brought in new talent where necessary. Ms. Warkow hired a consultant to customize a sales training program based on the gaps she identified in her team during her travels. Ultimately, S&P hired the consultant globally to deliver a customized eight-week sales training program for Ms. Warkow's Americas sales team along with the EMEA and APAC sales teams too.

26. By any account, Ms. Warkow achieved great success in her role at S&P. S&P's Ratings Division had the best year in sales in many years in 2024, with Ms. Warkow's team growing revenue by 38 percent year over year to end 2024 with $2.6 billion in sales. Ms. Warkow's sales team comprised 65 percent of the Ratings Division's revenue of $4 billion in 2024, with the other two sales teams at S&P, APAC and EMEA, combined contributing the remaining $1.4 billion. Ms. Warkow also achieved 3.6 percent in price growth in the Americas on that $2.6

7

billion amount. Despite being responsible for significantly less revenue, EMEA and APAC achieved a similar price growth of 3.7 percent. As a result of the extraordinary success of Ms. Warkow and her sales team, the bonus pool for the sales team and the entire Ratings Division was funded at 178 percent versus the prior year when it was funded at only 118 percent. In short, S&P had in fact reaped the benefit of Ms. Warkow's sales experience as it intended, and the sales team flourished in 2024.

27. Ms. Warkow also received rave reviews from her colleagues, stakeholders, and direct reports in informal communications and various formal surveys conducted by S&P, including an annual Vibe survey and a 360 survey. She repaired damaged relationships with the critically important analytical team, set up Key Performance Indicators for her direct reports and sales representatives and held her sales team accountable for their results. Ms. Warkow promoted, mentored, and coached five new Team Leads, three of which began new roles on July 1, 2025 with the reorganization spearheaded by Ms. Warkow. Each Team Lead achieved incredible growth in their markets. The Canada Team Lead grew sales 31 percent year over year; the Latin American Team Lead grew sales 12 percent year over year; the Specialized Finance Team Lead grew sales 87 percent year over year; the Primate Markets Team Lead grew sales 70 percent year over year. S&P's largest market is in Corporates and Ms. Warkow's newly promoted Corporates Team Lead grew the market share 38 percent year over year.

28. At the end of 2024, Ms. Correa's non-compete expired. Consistent with its plan all along, Ms. Warkow's supervisor, Ms. Maxwell, shortly thereafter in January 2025 abruptly informed Ms. Warkow that she needed to start looking for a new role within the company and suggested two departments which she suggested *might be* interested in Ms. Warkow. There was no guarantee she would be offered the new roles, however, and both were a step backward in terms

of responsibility and career growth for Ms. Warkow. For example, one position was potentially for a sales position, not a management position. Ms. Maxwell made these statements to Ms. Warkow despite Ms. Warkow's undisputed success with the sales team, positive feedback from her direct reports and peers, and lack of any negative feedback regarding her performance. Ms. Warkow was shocked, given that she had never received any negative feedback on her performance from Ms. Maxwell during her 14 months at the company. Ms. Warkow subsequently declined to voluntarily leave her executive level position and sales team that was set up to thrive in 2025 for a potential lower sales position within the company. The only reason Ms. Maxwell gave Ms. Warkow for wanting her to move out of the Head of Sales position was that Ms. Warkow would "never know the business as well as someone who has been in the business for 15 years." Presumably, Ms. Maxwell was referring to Ms. Correa.

29. Shortly thereafter, several people from the sales team approached Ms. Warkow and told her that Ms. Correa was telling people her non-compete had expired and it was time for her to take over the sales team.

30. In late January 2025, despite Ms. Warkow's success in her position, Ms. Maxwell presented Ms. Warkow with an unfavorable Full Year Performance Story littered with factual inaccuracies. She also placed Ms. Warkow on a 90-day Performance Improvement Plan, which was to be in place through April 30, 2025.

31. Ms. Warkow vehemently disagreed with the Performance Improvement Plan and shortly thereafter, complained to Kyle Webb about the lack of any factual basis for Ms. Maxwell's criticisms of her performance. Mr. Webb advised Ms. Warkow to document her disagreements with the Plan which she intended to do. However, because of significant and onerous work obligations, including travel out of state, placed on her by Ms. Maxwell in connection with the

Plan, Ms. Warkow was never able to do so before her termination. Ms. Warkow was never asked to sign the Performance Improvement Plan.

32. Despite her disagreement with the Performance Summary, Ms. Warkow immediately went to work fulfilling the items on the Performance Improvement Plan. But nothing Ms. Warkow could do would change the outcome which had been planned even before she was hired by S&P. Ms. Maxwell's treatment of Ms. Warkow continued to deteriorate, including bullying behavior seemingly designed to make Ms. Warkow quit, such as requiring Ms. Warkow to attend on camera conference calls at 6 a.m. multiple times a month and excessive requests for information in a barrage of emails each day. Then, on Friday, February 28, 2025 at 8:00 am, Ms. Warkow was terminated without notice for unspecified reasons. Not coincidentally, her termination occurred one day before S&P was granting all Managing Directors, including Ms. Warkow, their annual equity awards included in annual compensation packages. This amounted to $375,000 in equity for Ms. Warkow. Ms. Warkow's termination was also 12 days before S&P paid out 2024 performance bonuses. Ms. Warkow expected to receive the same amount of bonus that was paid to her direct reports in the range of 187 percent to 204 percent of base salary and above the 17 8percent at which the bonus pool was funded given that she was responsible for 65 percent of the entire firm's global $4 billion in revenue in 2024.

33. At 8:30 am on the same day Ms. Warkow was terminated, S&P announced that Ms. Correa would be the new Head of Sales, Americas for the company—which was S&P's plan even before it reached out to Ms. Warkow about potential employment.

34. At the time it hired Ms. Warkow, S&P and Ms. Cheung knew that they intended to place Ms. Correa in the position of Head of Sales, Americas when Ms. Correa's non-compete expired, and that is precisely what occurred. Despite their representations to the contrary, S&P's

and Ms. Cheung's true intent when they hired Ms. Warkow was to take advantage of Ms. Warkow's sales and management experience to turn the S&P sales team around, reorganize the sale team for success, fire the underperformers, improve the toxic culture, then replace Ms. Warkow with Ms. Correa when her non-compete expired. S&P and Ms. Cheung knew this was their true intent at the time they promised Ms. Warkow that, even without ratings experience, they were committed to helping her succeed in the position and that it was a long-term, stable position. S&P never disclosed any of these facts to Ms. Warkow when it was inducing her to leave her employ at PIMCO and come to S&P.

35. S&P and Ms. Cheung made the representations to Ms. Warkow that they did with the preconceived and undisclosed intention of not honoring the representations and moving her out of the position as soon as Ms. Correa's non-compete expired. In truth, S&P hired Ms. Warkow as a temporary placeholder to take advantage of her superior sales and management skills. Indeed, it was S&P's intention to use Ms. Warkow's expertise in sales and sales leadership to turn the sales team around and then hand the position to Ms. Correa as soon as her non-compete expired.

36. S&P and Ms. Cheung never disclosed to Ms. Warkow their true intent to move Ms. Correa into the position as soon as Ms. Correa's non-compete expired. Had S&P and Ms. Cheung disclosed S&P's true intentions, Ms. Warkow never would have left her long-term career at PIMCO and accepted employment with S&P.

### C. S&P deprived Ms. Warkow of the wages and benefits it owed her under the parties Agreement.

37. In conjunction with accepting employment with S&P, Ms. Warkow and S&P executed an offer letter and Agreement for the Protection of Company Interests (the "Agreement").

38. At the time S&P approached Ms. Warkow about employment, Ms. Warkow's annual compensation (excluding benefits and equity) at PIMCO was over $1.1 million. As part of

11

her PIMCO compensation package in 2023, Ms. Warkow was entitled to a $751,000 year-end bonus from PIMCO based on her performance in 2023 (but payable in December 2023). She also had unvested awards of $263,000 of M Units (similar to restricted stock units) and Long-Term Incentive Plan benefits (LTIPs).

39. To ensure Ms. Warkow was compensated comparable to what she was receiving at PIMCO, and to compensate her for the compensation and equity she forfeited at PIMCO by leaving before the end of the year, S&P Global agreed, as reflected in the Agreement, to pay Ms. Warkow the following:

(i) An annual base salary of $430,000;
(ii) Annual cash bonuses with a target incentive opportunity of 80 percent of base salary (bonus could be more depending on the company's performance);
(iii) A cash signing bonus of $751,000 to compensate her for the $751,000 year-end bonus she earned at PIMCO in 2023 but would not receive due to departing before January 1, 2024;
(iv) Annual $375,000 equity grants beginning with a grant in December 2023 (given in a combination of Restricted Stock Units (RSUs) and Performance Stock (PS) set to vest in equal tranches over three-year periods, with the first $375,000 award being comprised of all RSUs); and
(v) 414 RSUs to compensate Ms. Warkow for the $160,000 M Units she left behind at PIMCO.[1]

40. Importantly, under the Agreement S&P agreed that the 414 RSUs would be issued to Ms. Warkow "as soon as practically possible at the next available grant date," which was in December 2023, and that these RSUs would vest in "thirds on each anniversary of the award," by December 2026.

41. But S&P, contrary to their Agreement, failed to issue the 414 RSUs until June 2024, causing the RSUs to vest six months *later* than the Agreement provided for. This delay in issuance

---

[1] S&P also agreed to give Ms. Warkow equity to compensate her for LTIPs she was forfeiting at PIMCO. Ultimately, S&P did not have to do so because Warkow was allowed to retain her PIMCO LTIPs.

by S&P was not only in violation of their Agreement with Ms. Warkow but caused *none* of these RSUs to vest before Ms. Warkow's wrongful termination.

42. In sum, S&P agreed to give Ms. Warkow the 414 RSUs to entice her to leave her 17-year career at PIMCO and come to S&P. Yet, as with their false representations about the position she was assuming at S&P, S&P did not honor its Agreement with respect to the 414 RSUs either.

## COUNT I

## FRAUDULENT INDUCEMENT AGAINST S&P AND MS. CHEUNG

43. Plaintiff incorporates each of the foregoing paragraphs as if set forth fully herein.

44. Plaintiff's cause of action arises under New York common law.

45. As set forth in detail above, S&P and Ms. Cheung made material misrepresentations about the position with S&P for which Ms. Warkow was recruited. Specifically, S&P and Ms. Cheung represented to Ms. Warkow that S&P wanted Ms. Warkow because of her exceptional sales experience and expressly because she came from outside the ratings industry and would be able to infuse new ideas into the firm. Ms. Cheung told Ms. Warkow that she wanted Ms. Warkow to turn the struggling S&P sales team around and turn the team from "farmers" to "hunters." In this regard, Ms. Cheung also assured Ms. Warkow that it intended to invest in her as an employee, that it needed her sales expertise and that the position was long-term despite her lack of ratings experience. In reliance on S&P's and Ms. Cheung's representations, Ms. Warkow accepted the position at S&P.

46. As set forth in detail above, S&P and Ms. Cheung knew the representations they made to Ms. Warkow were false when they made them. They knew S&P intended to replace Ms. Warkow with Ms. Correa as soon as her non-compete expired in 2024. They also knew they were hiring Ms. Warkow on a short-term basis to reorganize and manage out the toxic employees and

13

expertly train S&P's ratings sales team, with the plan being to hand over that fully re-organized and trained sales team to Ms. Correa.

47.     S&P and Ms. Cheung knew or intended that Ms. Warkow would leave her employment with PIMCO and accept employment with S&P based on their false representations.

48.     Ms. Warkow relied on the representations of S&P and Ms. Cheung in making the decision to leave her long term employment with PIMCO and accept employment with S&P.

49.     Ms. Warkow was substantially harmed by leaving her employment with PIMCO and accepting employment with S&P. Ms. Warkow seeks recovery of damages she incurred as a result of S&P's and Ms. Cheung's fraudulent inducement in the form of wages, bonuses, equity and other benefits Ms. Warkow earned and would have received had she not left her employment with PIMCO.

## COUNT II

## BREACH OF CONTRACT AGAINST S&P

50.     Plaintiff incorporates each of the foregoing paragraphs as if set forth fully herein.

51.     Under the Agreement, S&P promised to award equity (in the form of 414 RSUs) to compensate Ms. Warkow for $160,000 worth of M Units (i.e., equity) she left behind at her former employer, PIMCO, to move to S&P. S&P promised to make this equity award to Ms. Warkow "as soon as practically possible *at the next available grant date*." S&P further promised that this equity award would vest in thirds on each anniversary of the award thereafter.

52.     The next available grant date after Ms. Warkow signed the Agreement was December 2023. Yet, contrary to the terms of the Agreement, S&P failed to award Ms. Warkow the promised equity at that time. Instead, S&P waited until six months later, on June 1, 2024, to award Ms. Warkow the promised equity in breach of the parties' Agreement.

14

53. This breach by S&P caused Ms. Warkow's equity not to vest until 6 months later than what was provided for under the parties' Agreement as well—with vesting to begin in June 2025 rather than December 2024, as agreed.

54. As a result of S&P's breach of the Agreement, upon Ms. Warkow's termination in February 2025, *none* of Ms. Warkow's 414 RSUs had vested yet. This breach of the Agreement caused Ms. Warkow to be damaged by approximately $72,000 for the first tranche of RSUs that *should* have vested in December 2024 prior to her termination had S&P followed the terms of the parties' Agreement.

55. Ms. Warkow seeks compensatory damages for S&P's breach of the Agreement.

## V.     JURY DEMAND

56. Plaintiff asserts her constitutional right and demands a trial by jury on all issues in this case.

## PRAYER FOR RELIEF

WHEREFORE , Plaintiff Brenda Warkow requests Defendants S&P Global Inc. and Martina Cheung be cited to appear and that Plaintiff be awarded:

1. Compensatory damages in an amount to be proved at trial;
2. Exemplary damages;
3. Pre-judgment and post-judgment interest as provided by law;
4. Costs of suit; and
5. Such other relief, at law or in equity, to which Plaintiff may show herself to be justly entitled.

Dated: April 11, 2025               Respectfully submitted,

                                         THE DWECK LAW FIRM, LLP
                                         ***ATTORNEYS FOR PLAINTIFF BRENDA WARKOW***
                                         1 Rockefeller Plaza, Suite 1712
                                         New York, New York 10020
                                         hpsdweck@dwecklaw.com
                                         212.687.8200
                                         212.697.2521 fax

                                         By:    ***s/ H.P. Sean Dweck***
                                                        H.P. Sean Dweck